IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRANCIS DAVIS STOVALL, IV,                3:15-CV-01328-BR

        Plaintiff,                        OPINION AND ORDER

v.

GABRIEL GALLEGOS,

        Defendant.

**BRADLEY C. LECHMAN-SU**
Lechman-Su & Quach PC
1 S.W. Columbia Street
Suite 1800
Portland, OR 97258
(503) 224-1640

        Attorneys for Plaintiff

**KELLY M. EVANS**
Gevurtz, Menashe, Larson & Howe, P.C.
115 N.W. First Avenue
Suite 400
Portland, OR 97209
(503) 227-1515

        Attorneys for Defendant

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on the Motion (#30) of Petitioner Francis Davis Stovall, IV, for Attorneys Fees and Cost Bill.  For the reasons that follow, the Court **GRANTS** Petitioner's Motion and awards Petitioner attorneys' fees in the amount of **$12,010.00** and costs in the amount of **$3,051.24**.


## <u>BACKGROUND</u>

The following facts are taken from the Verified Petition for Return of Child to Her Habitual Residence of Francis Davis Stovall, IV, and attachments thereto.

Petitioner and Respondent Gabriel Gallegos "have been together since 2000."  The child at issue in this matter, DGS, was born in 2001 in Portland, Oregon, and Respondent was listed as her biological parent on her birth certificate at that time.

At some point Petitioner and Respondent formed a limited liability company.  The terms of the formation of the parties' LLC are unclear on this record.  Respondent alleges in his Objections to Petitioner's Motion for Attorneys Fees that "Respondent understands that Petitioner believes Respondent only has a one percent interest in the LLC."

In October 2006 the LLC purchased real property in Izamel, Yucatan, Mexico.

From 2001 through 2009 DGS resided with Petitioner and

Respondent in Portland, Oregon.  Petitioner retired from his job as a Portland public schoolteacher in 2009.  At some point in 2009 Petitioner and DGS relocated to the property purchased by the LLC in Izamel, Mexico, with the consent of Respondent. Respondent continued to reside in Portland and to work as a TriMet bus driver.

In May 2010 Petitioner adopted DGS.  In June 2010 Petitioner's name was added to DGS's birth certificate as a parent of DGS.

On December 25, 2013, Petitioner and Respondent married in the State of Washington.

In November 2014 Respondent retired and moved to Izamal, Mexico, where he resided with Petitioner and DGS.

In April 2015[1] Petitioner and Respondent decided to separate.  At some point thereafter a dispute arose between them "over division of property."  Respondent alleges a dispute also arose at some point regarding whether Respondent would travel with Petitioner and DGS to Houston, Texas, in June 2015 for the birthday of Petitioner's mother.

Between approximately April 2015 and June 2015 the parties attempted to resolve the terms of their separation.  Respondent

---

[1] Petitioner states in his Verified Petition for Return of Child that the parties decided to separate in April 2014.  Based on the record before the Court, however, it appears 2014 was a clerical error and the parties actually decided to separate in April 2015.

alleges in his Objections to Petitioner's Motion for Attorneys Fees that "the terms became unacceptable . . . when Petitioner demanded Respondent move from the joint real property in Izamel, Mexico[, and] relinquish all interest in the property," which Respondent believes to be worth more than $200,000.  At that point the parties' negotiations reached an impasse.

On June 11 or 12, 2015, Petitioner traveled to Portland, Oregon, "to close a sale on" the parties' residence in the St. John's neighborhood.  When Petitioner returned to Mexico on June 20, 2015, Respondent and DGS were gone.  Ultimately it came to light that Respondent had removed DGS from Mexico to the United States on June 17, 2015, without the consent of Petitioner.

On June 19, 2015, Respondent sent an email to Petitioner in which he stated in pertinent part:

> I have thought about are [*sic*] situation here[, DGS] needs to have access to both her parents. Your decision for me to find somewhere else to live is not going to work.  You have been spending more time with your friends and leaving her alone here with her boyfriend.  Not Acceptable [*sic*]. She is only 14.  I know you trust her but she is still too young.
>
> Everyone here says that you leave her alone for hours with Henry.
>
> I have taken her back to the states.
>
> So now what I want is my half of what we originally agreed on.

* * *

[DGS] love [*sic*] it [in Mexico] and I do not want to do this to her.

But I have no choice you brought this on.

    Solution

You give me my half of the corporation.

You put [DGS's] name as beneficial [*sic*] if either one of us die.  As it stands her name is nowhere on the corporation or the property.

So if something were to happen to you[,] your family gets the property, that's not how we planned it.  Neither of us can ever sell.

    It's very simple.

We all remain on the property for the sake of [DGS] and only then will [DGS] and I . . . come back home.

    Change & Sign it.

            * * *

    Second choice

I sign off on this property [and] I get all the profit of the St. John's [property] minus your 13,000 and [DGS] will remain in the states.

Petition, Ex. 1 at 1-2.

    Respondent states in his Objections to Petitioner's Motion for Attorneys Fees that he left Mexico with DGS on June 18, 2015, with the intent to visit Respondent's family in Illinois and then to finalize the sale of the parties' property in Oregon. Respondent asserts Petitioner was aware of Respondent's intent to visit family and to close on the Oregon property sale. Nevertheless, Respondent concedes he authored the June 19, 2015,

5 - OPINION AND ORDER

email and "intended by the letter to 'force' Petitioner to resume negotiations related to the resolution of their dissolution of marriage." Respondent asserts he "only sought to encourage Petitioner to negotiate a resolution of the real property issue in good faith."

After the close and sale of the parties' property in Oregon in mid-June, Respondent remained in the United States with DGS. Petitioner and Respondent divided the sale proceeds from the sale of the Oregon property, and each received $52,000.

On July 17, 2015, Petitioner received an email from DGS stating:

> Papa
> Can we skype please
> Papa it's important
> Papa awnser [*sic*] please!!!
> Papa it's important please.

Pet.'s Decl. in Support of Reply, Ex. 3 at 1.

On July 17, 2015, Petitioner filed in this Court a Verified Petition for Return of Child to Her Habitual Residence in which Petitioner alleged Respondent had wrongfully removed DGS from her habitual residence in Mexico in violation of the Hague Convention and the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001, *et seq*. Petitioner sought, among other things, an order directing DGS to be returned to her habitual residence in Mexico and for attorneys' fees and costs pursuant to Article 26 of the Hague Convention and 22 U.S.C. § 9007.

6 - OPINION AND ORDER

On July 21, 2015, the Court entered an Order to Show Cause directing Respondent to appear and to show cause why Respondent should not turn DGS over to Petitioner or, in the alternative, to return DGS to Mexico.

On July 23, 2015, Respondent retained counsel.

On July 29, 2015, the Court held a show-cause hearing at which Respondent's counsel advised the Court that Respondent denied receiving actual or other notice of the July 29, 2015, hearing. Accordingly, the Court issued a second Order to Show Cause directing Respondent to appear on August 5, 2015, and to show cause why Respondent should not turn DGS over to Petitioner or, in the alternative, return DGS to Mexico.

In his Objections to Petitioner's Motion for Attorneys Fees Respondent states Petitioner's counsel advised Respondent's counsel in a July 29, 2015, telephone conversation about "the mandatory nature of attorney fees in contested Hague Convention cases." Respondent's counsel verified that assertion, and the parties then "immediately began negotiating a return of DGS to Mexico."

On August 5, 2015, the Court struck the show-cause hearing based on a stipulated agreement between the parties to maintain the status quo while negotiations proceeded.

On August 13, 2015, Petitioner sent a letter to Respondent outlining Petitioner's position regarding settlement.

On August 19, 2015, the parties filed a Joint Alternative Dispute Resolution (ADR) Report in which they noted, among other things, that "[t]here is agreement to return DGS to Mexico, with ongoing discussions about the procedure and conditions for return of DGS"; the parties had undertaken settlement negotiations regarding the dissolution of their marriage; and "[s]ignificant progress has been made in resolving the Hague case."

On August 19, 2015, Respondent filed a Petition for Unlimited Separation in Multnomah County Circuit Court in which Respondent asserted, among other things, that Oregon was DGS's home state and Respondent should be awarded custody of DGS. Respondent served Petitioner in the state-court action on August 20, 2015.

On August 21, 2015, as a result of Respondent's filing of the state-court matter, Petitioner filed an ADR Report in this Court in which he asserted there was "no agreement to return DGS"; Petitioner had sent a written settlement offer to Respondent on August 20, 2015, before being served with the state-court action; and Respondent had not responded to the settlement offer.

On August 21, 2015, Respondent replied to Petitioner's August 20, 2015, settlement offer via email. Notwithstanding the assertion about DGS's Oregon residence and the statement that Respondent sought custody of DGS in the state-court matter,

8 - OPINION AND ORDER

Respondent noted in the August 21, 2015, email that

> [Respondent] does not object to [DGS] returning to
> Mexico.  The filing in Circuit Court was simply
> intended to ensure that the parties resolved the
> other divorce issues in Oregon.  If the matter was
> not filed in Oregon I do not believe there is
> currently a jurisdiction that could divorce the
> parties. . . .  [T]his filing has NOTHING to do
> with [DGS]. . . .  [M]y client is in agreement
> that [DGS] should return to Mexico immediately.
> The only issue to be resolved was who takes her
> back to Mexico.

Objs. to Pet.'s Mot. for Attorneys Fees, Ex. 102 at 1.  The

parties continued to negotiate.

On August 25, 2015, the parties filed an Amended Joint ADR

Report in which they advised the Court that they had reached a

negotiated agreement regarding the return of DGS to Mexico.

On August 26, 2015, the Court entered an Order approving the

terms of the agreement described in the August 25, 2015, Amended

ADR Report and directed the parties to submit an agreed form of

order consistent with the ADR Report.

On August 27, 2015, the Court entered an Order for Return of

Child to Her Habitual Residence in which the Court ordered, among

other things, DGS to be returned to Mexico on August 28, 2015,

accompanied by Petitioner; Respondent to remove certain personal

items from the parties' property in Mexico and then leave the

real property; and the parties to submit a judgment of dismissal

to the Court after DGS arrived in Mexico.

On October 5, 2015, Petitioner filed a Motion for Dismissal

9 - OPINION AND ORDER

of Child Custody Claim in the Multnomah County Circuit Court on the ground that the state court lacked subject-matter jurisdiction to decide child-custody issues because Mexico is DGS's home state.

On December 15, 2015, the parties submitted a Joint ADR Report in which they advised the Court that DGS had been returned to Mexico; Multnomah County Circuit Court had granted Petitioner's Motion to Dismiss the child-custody claim and entered a judgment on November 16, 2015; and Petitioner had filed a custody action in Izamel Family Court in Mexico.

On December 16, 2015, the Court entered a Judgment dismissing this matter.

On December 30, 2015, Petitioner filed a Motion for Attorneys Fees and Cost Bill in which he seeks $12,720 in attorneys' fees and $3,051.24 in costs.  The Court took Petitioner's Motion under advisement on February 5, 2016.


**STANDARDS**

Article 26 of the 1980 Hague Convention provides in pertinent part:

> Upon ordering the return of a child or issuing an
> order concerning rights of access under this
> Convention, the judicial or administrative
> authorities may, where appropriate, direct the
> person who removed or retained the child, or who
> prevented the exercise of rights of access, to pay
> necessary expenses incurred by or on behalf of the
> applicant, including . . . the costs of legal

representation of the applicant.

The ICARA, which implements the obligations of the United States under the 1980 Hague Convention, provides:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall* order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs [and] legal fees . . . related to the return of the child, unless the respondent establishes that such order would be *clearly inappropriate*.

42 U.S.C. § 11607(b)(3)(emphasis added).  The ICARA "contemplates the use of such awards to restore a petitioner to the financial position he or she would have been in had there been no removal or retention, as well as to deter violations of the Hague Convention."  *Aguilera v. DeLara*, No. CV-14-01209-PHX-DGC, 2014 WL 4204947, at *1 (D. Ariz. Aug. 25, 2014)(citing Hague International Child Abduction Convention, 51 Fed. Reg. 10494-01, 10511 (Mar. 26, 1986)).

An award of attorneys' fees and costs is "appropriate" when the case is not a "difficult" one and "'falls squarely within the heartland of the Hague Convention.'"  *Cuellar v. Joyce*, 603 F.3d 1142, 1143 (9th Cir. 2010)(quoting *Cuellar v. Joyce*, 596 F.3d 505, 511 (9th Cir. 2010)).  "The respondent bears the burden of establishing that an award of fees and costs would be clearly inappropriate under the circumstances."  *Aguilera*, 2014 WL 4204947, at *1 (citing *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004)).

11 - OPINION AND ORDER

## DISCUSSION

Respondent does not dispute the Court entered an Order for Return of DGS on August 27, 2015, and, therefore, Article 26 of the Hague Convention and 42 U.S.C. § 11607(b)(3) apply. Respondent, however, asserts the Court should conclude an award of attorneys' fees and costs to Petitioner is "clearly inappropriate" because (1) a state-law action under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), adopted by the State of Oregon at Oregon Revised Statute § 109.701, *et seq.*, would have led to the same resolution without invoking the Hague Convention; (2) Respondent has limited financial means to pay an award of attorneys' fees and costs; and (3) Petitioner agreed to DGS's removal to the United States.

## I.   A UCCJEA action would not have led to the same resolution.

As noted, Respondent asserts an award of attorneys' fees and costs would be clearly inappropriate because an action in Oregon state court pursuant to the UCCJEA would have had the same outcome and would not have resulted in attorneys' fees and costs. As Petitioner points out, however, Oregon courts did not have jurisdiction over the child-custody matter in this case because Oregon was not the home state of DGS within the meaning of Oregon Revised Statutes §§ 109.704 and 109.741. In addition, even if Oregon state courts had jurisdiction, the attorneys' fee provision for enforcement actions under the UCCJEA found in

Oregon Revised Statute § 109.811 states:

> The court shall award the prevailing party, including a state, necessary and reasonable expenses incurred by or on behalf of the party, including costs, communication expenses, attorney fees, investigative fees, expenses for witnesses, travel expenses and child care expenses during the course of the proceedings, unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate.

This provision is similar to the one regarding attorneys' fees and costs found in the ICARA. Thus, even if Oregon state courts had jurisdiction to decide the parties' child-custody issue (which they do not), Petitioner still could have received an award of attorneys' fees and costs using virtually the same standard as this Court applies when evaluating an award under the ICARA.

## II. Respondent's ability to pay attorneys' fees and costs.

Respondent asserts an award of attorneys' fees and costs is "clearly inappropriate" because he does not have the ability to pay such an award. Specifically, Respondent states he is retired and living on his pension of $1,700 per month. Respondent also notes he "is spending more on his HIV medication than he would otherwise be spending in Mexico" (although Respondent does not specify how much he spends on medication). Petitioner, however, points to a letter from Respondent's counsel produced in discovery that indicates Respondent owns three cars and a Winnebago as well as other assets.

13 - OPINION AND ORDER

Courts have reduced attorneys' fee awards under the ICARA based on respondents' financial circumstances.  For example, in *Rydder v. Rydder* the court noted the respondent had stock valued at $18,683, but she had "worked only sporadically as a substitute teacher."  49 F.3d 369, 372 (8th Cir. 1995).  The court reduced the district court's award of attorneys' fees of $18,487 to $10,000 due to the respondent's "strained financial circumstances."  *Id*. at 373-74.  The court, however, "le[ft] undisturbed" the award of expenses in the amount of $9,667. Thus, the court found a total award of attorneys' fees and costs of $19,667 was not "clearly inappropriate."  Similarly, in *Willing v. Purtill* the petitioner sought $33,729 in attorneys' fees and $10,052 in costs.  No. 07-CV-1618-AA, 2008 WL 299073, at *1 (D. Or. Jan. 31, 2008).  The court awarded the petitioner all of her costs.  The court, however, noted the respondent was unemployed and, therefore, concluded a full award of attorneys' fees would be "clearly inappropriate."  Accordingly, the court awarded attorneys' fees of $28,669.  *Id*., at *1.  *See also Berendsen v. Nichols*, 938 F. Supp. 737, 739 (D. Kan. 1996) (reducing attorneys' fees and costs award by 15% in light of the respondent's financial condition and because awarding full fee would "unduly limit" the respondent's ability to support his children).

Here Respondent is retired, but he is receiving a pension.

In addition, Respondent chooses to remain in Oregon to litigate his divorce rather than in Mexico.  Finally, the Court recognizes attorneys' fees of approximately $12,000 can be steep for a retired individual, but the Court concludes the amount is reasonable in light of the purpose of attorneys' fees under the Hague Convention to "deter violations of the Hague Convention." *Aguilera*, 2014 WL 4204947, at *1 (citing Hague International Child Abduction Convention, 51 Fed. Reg. 10494-01, 10511 (Mar. 26, 1986)).

**III. Removal of DGS from Mexico.**

Respondent asserts an award of attorneys' fees and costs is clearly inappropriate because "Respondent's position is that Petitioner not only acquiesced to the removal [of DGS from Mexico], but further agreed to her removal and facilitated the removal by providing DGS's passport to Respondent."

"The determination of the reasonableness of attorney fees and whether an award would be 'clearly inappropriate' is not the place to 'rehash' the merits of the parties' dispute." *Sullivan v. Sullivan*, No. CV-09-545-S-BLW, 2010 WL 1651994, at *2 (Apr. 21, 2010).  In addition, the record establishes Respondent sent Petitioner the June 19, 2015, letter, in which Respondent made clear that he removed DGS from Mexico and did not intend to return her unless Petitioner gave Respondent half of the LLC or gave Respondent "all the profit of the St. John's [property]

15 - OPINION AND ORDER

minus your 13,000 and [DGS] will remain in the states."  The
letter strongly indicates Petitioner did not consent to DGS
remaining in the United States.  Respondent concedes he "intended
by the letter to 'force' Petitioner to resume negotiations
related to the resolution of their dissolution of marriage."
Thus, Respondent intended to keep DGS in the United States as
long as necessary and against the wishes of Petitioner as a
bargaining chip for the property in dispute.

On this record the Court is unpersuaded by Respondent's
assertion that Petitioner acquiesced in DGS's removal and,
accordingly, concludes an award of attorneys' fees and costsis
not "clearly inappropriate."

**IV. Amount of Attorneys' Fees**.

As noted, in his Motion for Attorneys Fees and Costs
Petitioner seeks $12,720 in attorneys' fees.  Respondent does not
object to the hourly rate sought by Petitioner's counsel.
Respondent asserts only that the parties' negotiations in this
matter were "[f]or all intents and purposes . . . resolved on
August 19, 2015," and, therefore, the Court should not award
attorneys' fees incurred after that date.

The Supreme Court has made clear "the lodestar approach" is
"the guiding light" in determining a reasonable fee under federal
fee-shifting statutes such as the ICARA.  *Perdue v. Kenny A.*, 130
S. Ct. 1662, 1671-73 (2010)(internal quotation omitted).  Under

16 - OPINION AND ORDER

the lodestar method the court first determines the appropriate
hourly rate for the work performed and then multiplies that
amount by the number of hours properly spent doing the work.  *Id.*
 Although "in extraordinary circumstances" the amount produced by
the lodestar calculation may be increased, "there is a strong
presumption that the lodestar is sufficient." *Id.* at 1669.  The
party seeking an award of fees bears "the burden of documenting
the appropriate hours expended in the litigation, and [is]
required to submit evidence in support of those hours worked."
*United Steelworkers of Am. v. Ret. Income Plan For Hourly-rated
Emp. Of Asarco, Inc.*, 512 F.3d 555, 565 (9th Cir. 2008)
(quotations omitted).  When "determining the appropriate number
of hours to be included in a lodestar calculation, the district
court should exclude hours 'that are excessive, redundant, or
otherwise unnecessary.'" *McCown v. City of Fontana*, 565 F.3d
1097, 1102 (9th Cir. 2009) (quoting *Hensley v. Eckerhart*, 461
U.S. 424, 434 (1983)).

       To determine the lodestar amount the court may consider the
following factors:

               (1) the time and labor required; (2) the novelty
               and difficulty of the questions involved; (3) the
               skill requisite to perform the legal service
               properly; (4) the preclusion of other employment
               by the attorney due to acceptance of the case;
               (5) the customary fee; (6) whether the fee is
               fixed or contingent; (7) any time limitations
               imposed by the client or the circumstances;(8) the
               amount involved and the results obtained; (9) the
               experience, reputation, and ability of the

> attorneys; (10) the undesirability of the case;
> (11) the nature and length of the professional
> relationship with the client; and (12) awards in
> similar cases.

*Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1007 n.7 (9th Cir. 2002)(quotation omitted).  A rote recitation of the relevant factors is unnecessary as long as the court adequately explains the basis for the award of attorneys' fees. *McGinnis v. Kentucky Fried Chicken of Cal.*, 51 F.3d 805, 809 (9th Cir. 1995).

    The lodestar amount is presumed to be the reasonable fee, and, therefore, "'a multiplier may be used to adjust the lodestar amount upward or downward only in rare and exceptional cases, supported by both specific evidence on the record and detailed findings by the lower courts.'"  *Summers v. Carvist Corp.*, 323 F. App'x 581, 582 (9th Cir. 2009)(quoting *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000)).

  "Adjustments [to the lodestar amount] must be carefully tailored . . . and [made] only to the extent a factor has not been subsumed within the lodestar calculation." *Rouse v. Law Offices of Rory Clark*, 603 F.3d 699, 704 (9th Cir. 2009)(citing *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 982 (9th Cir. 2008)).

### A.    Hourly Rates for Plaintiff's Counsel

    Petitioner's counsel Bradley Lechman-Su requests attorneys' fees at an hourly rate of $300.  As noted, Respondent does not object to Lechman-Su's requested hourly rate.

18 - OPINION AND ORDER

To determine the reasonable hourly rate this Court uses the most recent Oregon State Bar Economic Survey published in 2012 as its initial benchmark.  Attorneys may argue for higher rates based on inflation, specialty, or any number of other factors.

Lechman-Su had 25 years of experience during the course of this matter.  According to the 2012 Oregon Bar Economic Survey, the median rate for attorneys in the Portland area with this level of experience was $326.  The Court, therefore, concludes Lechman-Su's requested rate of $300 per hour is reasonable.

**B.    Legal-Assistant Rate.**

Petitioner requests 10.9 hours of time for legal assistant Debbie Best at $125 per hour and .7 hours of time for legal assistant Tamera Meisner at $175 per hour.  Petitioner, however, did not provide any information regarding the reasonable hourly rates for legal assistants in the Portland area where these individuals worked.  In addition, Petitioner did not provide any information as to the experience of the legal assistants.  Accordingly, the Court reduces to $100 per hour (a minimal rate the Court can support on this scant record), the rate at which fees may be awarded for paralegal time.

**C.    Time Expended**

19 - OPINION AND ORDER

Respondent asserts this matter was resolved "for all intents and purposes" as of August 19, 2015, and, therefore, the Court should decline to award any attorneys' fees after that date.  The Court disagrees.  As noted, on August 19, 2015, Respondent filed a Petition for Unlimited Separation in Multnomah County Circuit Court in which Respondent asserted, among other things, that Oregon was DGS's home state and Respondent should be awarded custody of DGS.  Respondent served Petitioner in the state-court action on August 20, 2015.  The filing of the state-court action necessitated further negotiations between the parties and additional filings with this Court.  In addition, the parties had to engage in further negotiations and discussions related to the return of DGS and termination of this matter.  The Court, therefore, awards Petitioner attorneys' fees incurred by Petitioner's counsel after August 19, 2015.

After a review of counsel's billing record, however, the Court notes several entries for hours that Lechman-Su and Best dedicated to the state-court matter.  For example, several entries indicate time spent to research and to draft the motion for dismissal of the child custody claims in the state-court matter.  The Court declines to award attorneys' fees for time expended in the state-court action and, therefore, reduces the time requested by Lechman-Su by 5.5 hours and the time spent by

Best by 2.2 hours.[2]

Accordingly, the Court awards Petitioner attorneys' fees in the amount of **$12,010**.

## V.  Costs

Petitioner requests costs in the amount of $3,051.24, which include the fee to file this action, postage/delivery and service fees, expert testimony fee, printing, and photocopies. Respondent does not object to Petitioner's requested costs.

### A.  Standards.

Absent a showing of circumstances not relevant here, an award of costs is governed by federal law.  *See Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003).

28 U.S.C. § 1920 allows a federal court to tax specific items as costs against a losing party pursuant to Federal Rule of Civil Procedure 54(d)(1).  Section 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3)Fees and disbursements for printing and witnesses;
> (4)Fees for exemplification and copies of papers necessarily obtained for use in the case;

---

[2] See Exhibit 1 for the Court's calculation of attorneys' fees and costs.

(5)Docket fees under section 1923 of this title;
(6)Compensation for court-appointed experts,
compensation of interpreters, and salaries, fees,
expenses, and costs of special interpretation
services under § 1828 of this title.

A bill of costs shall be filed in the case and,
upon allowance, included in the judgment or
decree.

B.  **Analysis**

As noted, costs generally are awarded to the prevailing
party in a civil action as a matter of course unless the court
directs otherwise.  Fed. R. Civ. P. 54(d).  The court must limit
an award of costs to those defined in 28 U.S.C. § 1920 unless
otherwise provided for by statute.  *Grove v. Wells Fargo Fin.
Ca., Inc.*, 606 F.3d 577, 579-80 (9th Cir. 2010).  *See also
Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*,
920 F.2d 587, 588 (9th Cir. 1990)(citing *Crawford Fitting Co. v.
J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987)).

The costs sought by Petitioner are specifically allowed
under § 1920.  Accordingly, the Court awards costs to Petitioner
in the amount of **$3,051.24.**


**<u>CONCLUSION</u>**

For these reasons, the Court **GRANTS** Petitioner's Motion
(#30) for Attorneys Fees and Cost Bill and **AWARDS** attorneys' fees
to Petitioner in the amount of **$12,010** and costs in the amount of


22 - OPINION AND ORDER

**$3,051.24**.

IT IS SO ORDERED.

DATED this 26th day of April, 2016.


                                        /s/ Anna J. Brown

                                        _____
                                        ANNA J. BROWN
                                        United States District Judge


23 - OPINION AND ORDER